We will hear argument next in Case 19-1039, Penneast Pipeline v. New Jersey. Mr. Clement. Mr. Chief Justice, and may it please the Court, long before the framing, it was clear that eminent domain was an essential element of sovereignty and that private parties could be deputized to exercise that power for infrastructure projects. Once the federal eminent domain power was exercised, this Court made clear that state lands are not immune, but states are entitled to just compensation like other property owners. New Jersey does not take issue with those precedents, but still asserts an immunity from the process used to ensure just compensation if not initiated by the federal government itself. That claim fails for two interrelated reasons. First, states acceded to the federal government's superior eminent domain authority in the plan of the Convention. In our system of dual sovereignty, only one sovereign can have the ultimate authority over land when the federal and state governments assert conflicting claims. The Supremacy Clause largely settles that debate, and New Jersey concedes that its sovereignty must yield when the federal government decides to take state property. But once it concedes that, it has no immunity left to assert in the proceedings necessary to effectuate the taking. That follows from the immovable property exception, which long predates the framing. No sovereign has ever had immunity from the eminent domain authority of a superior sovereign over immovable property. It also follows from the very nature of eminent domain. Eminent domain that depends on consent is an oxymoron. Second, the proceedings here are in rem and can only augment the state treasury. This Court has recognized that in rem proceedings pose a lesser threat to state sovereignty. Justices Washington and Story made the same point when the 11th Amendment was new. And of all in rem actions, eminent domain proceedings pose the least concerns. They allege no wrongdoing, they impose no liability, and they cannot be brought without federal authorization. The whole point of the proceeding is to ensure just compensation for a taking. New Jersey's effort to convert a constitutional remedy into a veto over the federally authorized taking is simply incompatible with our constitutional design. Mr. Clement, do you have any other examples outside the area of eminent domain where the federal government can delegate its powers to a private party and then the private party can exercise those powers in a way that's inconsistent with state rights? I'm not sure we do, Your Honor. I mean, in the sense that I do think there is a long and unbroken tradition of the eminent domain power being delegated, or maybe the better way to think about it is that a private entity is deputized to exercise the power. And I don't think we're asking for any ruling that would extend outside the eminent domain context, but I think all sovereigns, including New Jersey, have recognized that the ability to deputize the private actors to exercise the eminent domain power is really essential to developing infrastructure. What is it that makes the eminent domain power so unique? That it's the only example we have. It's really quite extraordinary to have private parties overriding state immunities. Well, first of all, Mr. Chief Justice, I'm not sure that's the right way to think about it, which is to say I think when somebody like Penn East acts pursuant to a deputized eminent domain power, it really is exercising the federal power directly, and it's not an ordinary citizen. I think one way to understand that is if Penn East doesn't provide sufficient compensation, it has violated the Just Compensation Clause and the Takings Clause. Now, we generally don't think that the Takings Clause applies to anyone other than a federal actor. It applies here because distinctly you have somebody exercising the federal eminent domain authority. Why is this such a problem? Why can't this private party join a federal officer as an indispensable party or whatever so that the federal government is part of the condemnation proceedings? So, Your Honor, I suppose Congress could alter the statute and do that, but Congress has been delegating or deputizing parties to exercise its eminent domain authority for well over 100 years. It's never done that, and I don't think there is any reason that they need to do that in order to save the authority. And, again, New Jersey exercises the ability to delegate or deputize private parties, and they don't appear in those proceedings either to my knowledge. Justice Thomas? Thank you, Mr. Chief Justice. Justice Clement, could you give me the language here that effectuates the deputizing of Penn East? Sure, Your Honor. I think it comes right from 15 U.S.C. 1717 F.H., and it says when any holder of a certificate of public convenience and necessity cannot acquire by contract or is unable to agree with the owner of the property to compensation be paid for the necessary right of way to construct, operate, and maintain a pipeline for the transportation of natural gas, it may acquire the same by exercise of the right of eminent domain. So how is that deputizing versus simply delegating? Look, it's a fine line, Your Honor. I think the reason I would think of it as better as deputizing is for two reasons. One, even if you go back to the old treatises, like I believe it's the Lewis treatise from 1888 that you relied on in your Kelo dissent, he says that it's really wrong to think about delegating the eminent domain authority because it is an inherently sovereign authority. So that's one reason I think of it more as deputizing rather than delegating. But the other reason is what I alluded to with the Chief Justice, which is it seems to me that when a private party does exercise the eminent domain authority, it is a limited purpose federal actor for purposes of the takings clause, and by parity of reasoning, it seems like it is also a federal actor for purposes of the 11th Amendment. Is there anything in any of the pleadings that suggests that, say, that Penn East is bringing this on behalf of itself and the United States? I don't think we really put it in those terms, Your Honor. I guess what I would say, though, is one thing that is evident from the pleadings is this is principally an in-rem proceeding. So the proceeding is Penn East versus 1.90 acres of land for purposes of an easement. So I do think it matters that this is not an action directly against the state in personam but is an in-rem action. I think you might have a better in-rem argument if the possession of the land or the rem was in the custody of the courts. But this is the interest we're talking about. It's in New Jersey, and it's under either possessory or control of New Jersey. It's not under the control of a court. Well, two things, Your Honor. First, 40 of the 42 parcels here are not possessory interests of the state. They're just environmental easements and the like. And second, I think as a matter of doctrine, immovable property in the jurisdiction is always in the possession of the court. It's not like personal property where maybe the court has to issue in personam process to a defendant to bring the property within the jurisdiction of the court. The land itself is in the territorial jurisdiction of the court, and that's why there's never been a sovereign immunity defense to an eminent domain action by the superior sovereign because of the immovable property exception. Thank you. Justice Breyer? There are a number of cases where this court has said if you're going to interfere with the sovereign immunity rights of the state, Congress has to do so clearly. You've read them. What are the ones take the ones, whatever three or two or three you think are the strongest against you? And then explain to me how you distinguish them. I'd appreciate that. Thank you, Justice Breyer. What I would say is all the cases that are looking for a clear statement are looking for it in the abrogation context. So they assume that there is a sovereign immunity that has to be abrogated. And we don't think there is any sovereign immunity here that needs to be abrogated at all. And I think that's true for two primary reasons. One is because no sovereign has ever had a sovereign immunity defense to an eminent domain proceeding by the superior sovereign ever in the history of the world. I mean, the immovable property exception was established well before the framing of the republic. And so we think there's just no sovereign immunity here to abrogate for that reason. But we also think you can get to the same result simply by looking at this as not just an in rem proceeding that is against the property and not against the state. But an extraordinary in rem proceeding where there is no allegation of wrongdoing, no effort to impose liability on the state. And the action can't be brought at all unless it's authorized by the federal government here in the process of a FERC certificate. Thank you. Justice Alito? Mr. Clement, let's start with the reason why a state may be sued by the United States. Is this a correct understanding of the reason for that rule? When New Jersey and other states entered the union and they read the Constitution, they saw the federal structure that was set up, and they read the scope of federal judicial power under Article 3. They had to realize that this meant that they were surrendering that portion of their sovereign immunity. I think that's fair, Justice Alito, though I would emphasize I think what principally did it for them and what they should have read is the supremacy clause as opposed to necessarily Article 3. Okay, the supremacy clause in Article 3. But this was something that this court thought they must have realized when they entered the union. This was part of the bargain. Now I understand your argument that they must also have realized that a sovereign can deputize a private party to exercise the condemnation power and therefore because they were surrendering their immunity from a condemnation suit by the United States, they necessarily were also surrendering their immunity with respect to a private party that might be deputized to exercise that power. But is that a fair inference? Is it a sufficient inference? Would it not have been entirely reasonable for a state to think, look, okay, we understand we're giving up our sovereign immunity against a condemnation suit by the United States, but we don't think that we necessarily are giving up our sovereign immunity with respect to a condemnation suit by a delegee, even though this is a rule that applies in other contexts. So Justice Alito, I don't think that would have been a reasonable inference because the eminent domain power has always been delegable. That is something that was well-established before the framing. So if they accepted at the framing, as I think they must have because of the supremacy clause, that they would not be able to assert a sovereign immunity from an eminent domain action brought by the federal government because they would presumably know about the immovable property exception, and they would understand that it's essentially an oxymoron to say that I'm going to assert a sovereign immunity defense against the superior sovereign who has eminent domain over everything in the realm. I think they would have understood that that was equally true whether the federal government exercised that through itself or by delegating a limited purpose federal agent. Is that a correct understanding of what the constitutional question boils down to in a word because my time has run out? Well, I think that's one way for us to prevail, but I don't think the constitutional question boils down just to that because I do think that you could decide this case just on the ground that there is properly understood no action against the state. It's against the property and along the lines of Hood and other decisions that have said in rem is different. All right, thank you. Justice Sotomayor? Mr. Clement, perhaps I don't understand these features and delegation is troublesome for me, and this doesn't apply to FERC, but we didn't have FERC. Could the government have delegated in your use of the term to a private entity the decision as to what route was necessary and to then condemn those portions of the route that it thought necessary? So, Justice Sotomayor, I think there would be a separate question there about whether the delegation was essentially sort of, you know, ascertainable enough for these purposes. I would say, though, if you go back to the exercise of eminent domain power historically, there had certainly been situations where the federal government gave less direction than you have here with respect to FERC. So, for example, you know, when the railroads were built, there was, you know, a fair amount of discretion given to the railroads to determine what land that they would be able to condemn. Now, I would say also that I think particularly when the sort of delegee has greater discretion, that's when you would probably look for Congress to put in more restrictions that certain land is off limits. And I do think when you have a situation like this where no pipeline traverses any land without the approval of FERC, and they can take into account whether, you know, this is excessive or whether not going through this particular piece of state land would require the pipeline to be substantially rerouted that would create additional environmental problems and the like, especially when the federal government is playing that role. It seems like most of the concerns that you have under the 11th Amendment with some private party with an unfettered right to sue are just simply misplaced. Counsel, your adversaries point to certain aspects of a condemnation proceeding that seem to lend themselves to sovereign to sovereign decision making. I do agree with you that just a simple appraisal is different. How much is this land worth? And you could, you hire a lawyer and the lawyer helps you with that. You can hire a party that does the same thing. That's basically your argument. But how about the negotiation aspects? The state argues that there is a sovereign to sovereign part of this process, which is you're not supposed to start condemnation until you've had negotiation. And why should I be forced as a sovereign to negotiate with a non-sovereign? So, Your Honor, I guess I would say that, you know, that is a part of their concern. But I think it's an odd concern because, you know, the sovereign immunity, the 11th Amendment immunity doesn't kick in until you really get to court. And, you know, honestly, it's at the end of the day, their problem was with that they had to negotiate with us. I still don't think that that would sound in any kind of normal sovereign immunity. I also think that it's not really the challenge that they have preserved to that sort of negotiation. And I still think they would be negotiating with FERC's agent. And I think it is important to keep in mind that in this process uniquely, Penn East is a limited federal actor for purposes of the takings clause. And the same logic should apply to the 11th Amendment. Thank you, Justice Kagan. Mr. Clement, you told the Chief Justice that we shouldn't think of this as a case about a private party condemning land, that we should think that Penn East essentially steps into the shoes of the government. And that raises questions in my mind as to what the government's involvement in this case was. In other words, was there any supervision by the government? Was there any participation by the government? Did any lawyers for the United States approve the timing of the condemnation action? Did any lawyers for the United States approve the parcels to be condemned? Is there anything that the U.S. itself was involved in in this case? Well, Justice Kagan, I guess you have to distinguish between what happened at FERC through the FERC agents and what happened sort of after that point. And, you know, I'm not here to tell you that after the specific route of the pipeline was approved by FERC in a process where objections were heard from all the property owners, including the state, and over 70 route modifications were made. That was all done under the auspices of the federal government. They approved the route and the certificate right down to which parcels were affected. Now, once that happens, the way it has worked for 70 years is that the certificate holder then gets to go into federal court, and certainly FERC can, by its rulemaking, sort of determine, generally speaking, when the timing is. It could, as it's suggested, and it has done recently, promulgate a rule that says that the certificate holder should not initiate the condemnation proceedings until the rehearing period at FERC is closed. It could change that timing. All of that's within their control, but I don't want to suggest that FERC is kind of directly sitting over our shoulder in the district court action. So New Jersey says that there were a whole range of things that Penn East did that the U.S. government would not have done. You know, New Jersey says the U.S. has an obligation to negotiate in good faith while you refuse to negotiate, that you rush to condemn the land before the route was finalized in a way that the U.S. government wouldn't have, that your interest in land valuation is different. In other words, that there were a whole set of litigation tactics or moves that a private party would have been perfectly legitimately made that the U.S. government would not have. So Justice Kagan, I don't think that's true. And, you know, if you go through each of those things, I mean, we didn't do anything here in terms of the timing that FERC didn't approve. And so I don't think FERC will say we did anything wrong in that respect. And I don't think if FERC were forced to do this differently, they would have necessarily done anything different. With respect to the negotiations, the district court found that, in fact, we did negotiate in good faith here. And so I don't think that's a material difference. And in terms of the valuation and the paying of just compensation, I mean, the way the federal government has been doing this for 100 years is for some of these infrastructure projects, they think that it's just much more efficient to have the private party act as the federal actor deputy. And they're not doing that to shortchange the property owner. And I would bet if you ran the empirical numbers, the property owners probably did better. But in all events, it's something that has been done by all sides in New Jersey for a long time. Justice Gorsuch? We focused a lot on what I call structural immunity under the Constitution and maybe a little less on the 11th Amendment. I just like to ask a question about that. I understand the argument that Penn East steps into the shoes of the federal government in many senses. But as I understand it, Penn East is a citizen of Delaware. That's what the lower court said. We have before us a suit in law or equity. Cole says that. So why doesn't this case fall within the plain text of the 11th Amendment itself, which limits the judicial power of the United States in cases by a citizen of one state against another state? So thank you, Justice Gorsuch. I think there's three answers to that. One is that this is not an action against the state within the meaning of the 11th Amendment. It's an action against the property. I also think, although Penn East… I'm putting aside the in rem argument. Fair enough. Put that aside. And the second is that although Penn East is a citizen of Delaware for all other purposes, I think for these purposes it is a limited purpose federal actor and it has liability under the takings clause. So I think that's another reason why the text is not a problem. And then the third reason is that even the most textualist justices, such as Justice Scalia, have kind of understood that the 11th Amendment, what it's really doing is kind of restoring the immunity that was there. I understand that the Amendment does other things. It's been read to do structural immunity. But just on its plain terms, we have a citizen of one state suing another state, right? Again, I would beg to differ on both counts, which is I think what you have is a federal deputy suing land. And if you look at the principal captions of these cases below, they are Penn East versus… But a federal deputy exists as a citizen of a state. It doesn't lose its citizenship, does it? How would that work? What authorities are for that? I don't think it loses its citizenship, but I don't think that's the capacity in which it's suing. And as a mere citizen of Delaware, it doesn't have takings liability. It has takings liability because it is a limited purpose federal actor, and that is really the posture in which it's coming into court. But it is a citizen of Delaware. It doesn't lose that by virtue of being deputized. It's just a deputy from Delaware. It's a deputy from Delaware, but, you know, if there were a human being who was a federal deputy from Delaware, they would still be a citizen of Delaware. But when they walked into federal court and filed an action, they wouldn't be filing it in that capacity. And I do think that's what ultimately matters. But I also think, you know, as to the text, you know, I mean, obviously, we put the NREM matter to one side. But, you know, I do think that is an important distinction here. And I think this is very parallel to this court's decision in Hood. Thank you. Justice Kavanaugh? Thank you, Chief Justice, and good afternoon, Mr. Collin. I just want to ask a question that might be both a softball and a fastball. But if you lose this case, what will happen? So, Justice Kavanaugh, if we lose this case, then, you know, this pipeline will, you know, not be built at least at anything like its current configuration. And depending on exactly how we lose this case, I think this pipeline, this federal interstate pipeline, until the law is changed, will, you know, be at the mercy of New Jersey, because I don't think there is a way to reroute this pipeline in a way that doesn't implicate a state interest in land. The parcels at issue here don't implicate it, but this pipeline has to cross the Delaware River somewhere, and half of the Delaware River belongs to New Jersey. So there's just no way for this pipeline to exist under the current law. And I think that does show why there is something fundamentally wrong here. I mean, New Jersey would be operating as a property owner in this context, and yet as a property owner, they would be trying to do something that they can't do as a sovereign, which is to exercise a veto over an interstate infrastructure problem that they recognize is concededly legitimate under FERC's authority, at least for purposes of this case. I think your answer encompasses, but does that mean you don't think FERC has any way to get involved and to avoid the problem that would be in your way if you were to lose this case? That's correct, Your Honor. I don't think there's any way short of an amendment of the statute for FERC to deal with this problem. Thank you. Justice Barrett? Good morning, Mr. Clement. I want to talk about your plan of a convention argument. At least as I read the brief, I don't see any historical support for the proposition that a state could be sued by a private party standing in the stead of federal government's eminent domain power. The cases that you cite, like immovable property cases like Georgia versus Chattanooga, all kind of rely on inference. As far as I can tell, too, it wasn't until 1876 in Cole that the federal government even instituted a condemnation action against the state. Is your plan of a convention argument not really your strongest one, and is your NREM and HUD argument better? I think they're both pretty good, Your Honor. If I could just try to convince you that the plan of the convention argument is a little better than you suggested. I'd just point out that the situation here is almost directly parallel to the situation in the United States against Texas, which New Jersey, of course, says is a legitimate plan of the convention ceding of sovereign immunity. As a matter of fact, it took longer for the federal government to assert an original jurisdiction action against the state than it took the federal government to exercise its federal eminent domain authority in the states. By my count, the first original action against the state was U.S. against North Carolina in 1890. But in both cases, even though it took 70 to 100 years for the federal government to exercise the power, the court still looked and said, OK, going back to the framing, we understand that the supremacy clause, which is part, obviously, of the plan of the convention, has certain implications. And one implication that is here is that once New Jersey concedes, as it does, and I think it must, that the federal government has the eminent domain authority over this property, then no sovereign ever has had an immunity defense against the taking of property pursuant to the eminent domain authority by the superior sovereign without respect to whether it's been delegated. OK, a movable property doctrine. Don't you think that the Chattanooga case had more to do with the fact that the land that Georgia had was located within another sovereign's borders, as opposed to here where this is land within New Jersey's own borders? Do we have to read that case your way? Well, obviously, Your Honor, you don't have to read it that way, our way. But what I would say is I think the principle is the same, which is in both cases, there's a recognition that there is a superior sovereign. The mechanism for making that recognition is different. In the Chattanooga case, Tennessee is the superior sovereign because the property is territorially within Tennessee. Here, this property is subject to the superior eminent domain claim of the federal government because of the supremacy clause. And what's so odd about New Jersey's position is they concede that the federal government has the power to take this property from them, which is the principle sort of recognition of eminent domain, yet they still think they can assert a sovereign immunity defense. And that's never been the case since before the framing. Thank you, Mr. Clement. A minute to wrap up, counsel. Thank you, Mr. Chief Justice. In the end, New Jersey's position amounts to a claim that the federal government has less eminent domain authority than any other sovereign. New Jersey itself not only exercises eminent domain, but freely deputizes a wide range of utilities, including pipelines, to exercise that power and provide just compensation. The claim that the federal government is only a junior varsity sovereign was rejected in the plan of the convention. Where the federal eminent domain power exists, it is complete, and there can be no sovereign immunity defense to its implementation. Indeed, thanks to the immovable property exception, a sovereign immunity defense to the ultimate sovereign's eminent domain authority is an oxymoron. That is particularly true because eminent domain proceedings are unique in rem proceedings that assert no wrongdoing, impose no liability, and can only augment the state treasury. Thank you, counsel. General Needler? General Needler? I'm sorry. Mr. Chief Justice, and may it please the court, under the Natural Gas Act and this court's decision in the city of Tacoma, the courts below were without jurisdiction to resolve respondents' statutory challenge to pennies exercised of the right of eminent domain. By contrast, the courts below were not precluded from resolving the state's contention that the 11th Amendment bars pennies condemnation actions. But there is no such 11th Amendment bar. This court held in cold that the federal government's power of eminent domain is complete in itself and that no state can prescribe the manner in which it may be exercised. That power indisputably extends to state-owned property, and it has been established since before the founding that the sovereign's right of eminent domain includes the power to authorize private entities to exercise that right for roads, canals, and other infrastructure projects. The district court, therefore, may proceed with these actions to determine the amount of compensation that is owed to the state for this federally authorized taking of its property. Putting aside your jurisdictional issue, Mr. Kneedler, a private party with a certificate under the Natural Gas Act, could they bring a condemnation action against federally owned land? No, they could not, Mr. Chief Justice. There are separate statutes that deal with the acquisition of a right of way across federal property. The court's decision last year in the Atlantic Coast Pipeline case dealt with some of those issues in terms of getting a right of way across federal property, and this statute would not authorize that. Well, but I thought the idea was that the private parties are actually federal delegates, and that would be the capacity in which they would be acting. They would be federal delegates, but they would still have to comply with the statutory structure that Congress has established for acquiring rights of way over federal land. And also, a statute would ordinarily not be regarded as dealing with the enacting sovereign's own rights and own rights in property. This is a statute that deals with non-federal property, with state-owned property, in this case, or private property. Your client wants this pipeline to be built. Why don't you just have a federal official join the action and then advise the court that the federal government is proceeding along with Penn East? I think in order for the United States to become a party, there would have to be some statutory authorization for the United States to conduct the eminent domain proceeding. I suppose a federal attorney could attend and advise and participate in some sense, but that doesn't seem to be the defense being offered by the state. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Kneedler, do you agree with the petitioner that they are somehow a limited-purpose federal actor or that they've been deputized by the U.S. to condemn property? I think basically, yes. Various terminologies have been used. Cooley describes the person as a public agent. This court in the Cherokee Nation said that the private person is an instrumentality of the government, delegee. A lot of labels are used, but basically, the Constitution authorizes Congress to vest or allow a private party to exercise the right of eminent domain. So I think saying that the private party is deputized is a fair characterization, but I don't think anything turns on the particular label. Do you need a clear statement in order to accomplish that, or do we just simply imply that? You do not need a clear statement. The clear statement issue comes in where the question is whether Congress has abrogated an existing immunity. In our view, and we agree with the petitioner on this, there is no immunity to abrogate to begin with. So the question is applying ordinary principles of statutory construction, whether the statute authorizes the private party to commence the eminent domain proceeding. And here we think it's clear that it does. Respondent acknowledges that FERC could properly cite this pipeline across state lands, and the statutory provision here says that whenever a certificate is issued, the certificate holder can exercise the right of eminent domain if it can't acquire the property by agreement in order to complete the project. And that authorization has to apply to all the land over which the pipeline has issued. Otherwise, the pipeline couldn't be built. Thank you. Justice Breyer? Yes, thank you. If you were to lose this case, what would happen to the network of pipelines across the country now, at least those segments which were taken from states or on state land that were taken through eminent domain? Well, those that – I assume those that were acquired by agreement or – No, no, forget that. Those taken by eminent domain. To the extent there are ones taken by eminent domain, I think the judgments in those cases would stand. Perhaps the states in those cases might try to have those judgments reconsidered, but I think they would – If I suppose that an owner of one of those segments, a state, said, we do not want inspectors or repair people to come onto our property which was taken by eminent domain, though improperly. I think the eminent domain judgment would still stand. Now, there could be situations in which what the pipeline acquired was a time-limited easement, and so if that had to be renewed, even though the pipeline is now in place, if the state said, well, we don't want this pipeline anymore, and we're not going to renew your easement, that could be a problem. In fact, would be a problem. So in that situation, the court's decision could have an impact on existing pipelines. Thank you. Justice Alito? Do you agree that the condemnation actions here are really in-rem proceedings that don't implicate sovereign immunity at all? They are in-rem. It is not our position that the mere fact that something is in-rem means that it is not – that sovereign immunity principles don't apply at all. I mean, that's an important principle for the United States government, that a suit against the government's property is a suit against the United States. We've got Minnesota versus United States and the United States versus Alabama for that proposition. But we do think that in the end, the nature of the proceeding as in-rem, when coupled with the longstanding tradition of enabling private parties to exercise it, we think those things in combination do support the validity of it, because what's left after FERC has approved the pipeline route, it's a federally authorized taking. All that is at issue anymore is the amount of compensation to be paid to the state. It's not the sort of situation involved in Blatchford or other cases where it's a claim for money from the state based on state wrongdoing. So I think that the nature of it as an in-rem procedure that is triggered by federal authorization, we do think that that supports the position that there is no sovereign immunity. Thank you. Justice Sotomayor? I'd like to address your jurisdictional argument. It does seem strange to require a state to initiate litigation in one court of appeals, the D.C., in order to invoke sovereign immunity in another when it hasn't been sued yet, so there's no existing claim against it that it could raise the defense in. How does that make sense? Well, the statutory question of Penn East's capacity to sue is not an immunity question. It is a question of whether they have the power under the certificate issued by FERC to execute that certificate, which is the way the court put it in the City of Tacoma case, to execute that specifically with respect to exercising the right of eminent domain against state property. That was the very question at issue in City of Tacoma, and the court held that that had to be litigated, if at all, on direct review of the FERC's petition. So isn't this, I mean, instead of requiring a suit in the D.C. Circuit to decide this issue, why couldn't you just, why couldn't Penn East have just raised this as, I guess, collateral estoppel? Because that's really its argument, isn't it? That the delegation to Penn East could have and wasn't challenged in the D.C. Circuit, so it's collateral estoppel? I guess it would be claim preclusion. Yes, claim preclusion. I think you're right. I think that, I mean, that would apply, but I think City of Tacoma and the statute are statutory strong forms of claim preclusion, because they also require that the issue be raised before the agency. And, in fact, FERC did address various questions about the right of eminent domain, but the state did not make this argument and didn't raise it on judicial review, and we think under City of Tacoma it can't be raised in the district court. But that doesn't mean that the actual immunity, 11th Amendment immunity question can't be raised, and that's properly before the court, and we think there is no such 11th Amendment immunity. Thank you, counsel. Justice Kagan? Mr. Kneedler, suppose the federal government didn't like something about the way Penn East was conducting this litigation, whether it had to do with negotiating with New Jersey or with valuation decisions or anything else. If the U.S. didn't approve of something, could it do anything, and if so, what? Well, we haven't addressed that. I suppose it's possible. I don't know what the FERC procedures would be, but it might be possible for the state to request suspension or a stay of the certificate. I don't know if that would be something that FERC could do. It could be asked to do that. Perhaps some appeal to FERC to exercise some sort of persuasion in the conduct of this, and after all, FERC does not have an interest in a pipeline behaving badly. But I don't think there's any basis for thinking that that's going to be true. These are ordinary conversations. Well, Mr. Kneedler, my concern here is that in several cases we've talked about the need for a suit against states to be conducted by politically responsible actors, federal lawyers, and whether there's not something that's really lost by giving this over to private parties who have their own interests separate and apart from what the governments might be. Well, the critical decision with respect to these condemnation actions, whether the state's property will be taken has been made by FERC, which is politically responsible. There's no question that FERC is responsible. Right, but in the conduct of the suit, and we all know that the conduct of the suit can involve important questions. Well, here it is a very narrow question in terms of the amount of compensation, and that's the sort of issue that courts decide all the time with a party on one side and in this case a state on the other side, but condemnation proceedings are handled in court all the time. Thank you, Mr. Kneedler. Justice Gorsuch? So, Mr. Kneedler, I'd just like to return to the 11th Amendment itself, putting aside larger questions of structural or sovereign immunity. And I discussed with Mr. Clement whether Penn East is a citizen of Delaware, that's one issue, and then the other is whether we have a suit in law on equity. And the NREM was proffered as a way to get around that, but I'm not sure how that happens when this court has said repeatedly, as far back as 1875 in Cole versus the United States, that proceeding would take land and determine compensation is a proceeding in common law, would seem to be a suit in law on equity, whatever else it is. So, what's wrong with that? Why doesn't this fall within the plain text of the 11th Amendment itself? Well, I think there is the argument that Penn East is, in its capacity, is suing as an agent or however you want to describe it. You know, I understand it's a delegate, an agent, we've got a lot of words, a deputy, but a deputy has a residence and this deputy's residence is Delaware. Right, and I accept that, and we're not saying that the company is not a citizen of Delaware. Whether this is a suit against the state under the particular circumstances of this case is another question, given the NREM nature of it, but we think the basic point— Well, I mean, help me with that, because it is sued against the state in law or on equity, and this court has said a proceeding to take land, a determined compensation, is just such a thing. It is a suit in law or equity. I mean, there's a further question of whether it is against the state because of the NREM nature, but our basic point, though, is that the 11th Amendment— The state is the one that titled the compensation, right? Yes. Money will be provided to the state. Right. So how is it not a suit against the state in common law? I think probably the better understanding is that it is a suit against the state, but I think the point is that this is a proceeding of a distinct character, and the 11th Amendment was simply meant to restore an immunity that had been taken away by the court, and that preexisting immunity was one that structurally did not bar this sort of action by someone whom Congress has vested with eminent domain authority. Thank you. Justice Kavanaugh. Thank you. I have no additional questions. Justice Barrett. Jimmy, I have a question just to follow up on one that Justice Gorsuch asked you. You said that you thought, when he was asking you about the 11th Amendment, that maybe the better way to think of this was that it was a suit against the state, and I've been trying to get my mind around what role this in rem issue plays in all this, and particularly because Federal Rule of Civil Procedure 71.1 required the state to be joined as a party, as a property owner. So if you say the better way to think of it is really a suit against the state, you said you've accepted Penny's argument about the in rem nature of the proceeding. How does 71.1 and the in rem nature of the proceeding and your concession to Justice Gorsuch bear on that? Well, the 71.1 requires that the property owner be identified for purposes of getting notice. What the consequence of that is in terms of party status in the 11th Amendment, I think, is a different question. But, again, our basic point is that this is not the sort of action to which the states were immune to begin with. Well, no, no, no, I understand that, but I'm asking specifically, you said to Justice Gorsuch that the better way to think of this is that it's a party against the state. So I was asking how that bears on how we should think about this specifically as an in rem proceeding, because that's one of Penny's arguments, of course, that sovereign immunity doesn't apply here. So is it in rem or is it more in personam? I think, frankly, its character is more in rem. The state obviously has an interest in it, and it's a particular kind of in rem where the consequence is the payment of money to the state in exchange for its property. It's sort of a contractual exchange in that respect. So it's not the sort of proceeding that the 11th Amendment, as this court has described, is most concerned about, which is a suit for damages against the state where the state might be a wrongdoer. And here, where the federal government itself has decided that the particular land should be taken, the only question is the compensation. So it's in that respect, we think, that the in rem character of the suit matters. And also plays into or coincides with the fact that the states were not immune from this sort of action by the federal government or its agent. Thank you, Mr. Nicholson. A minute to wrap up. Mr. Niegar? Yes. I'd like to underscore the importance of the immovable property exception in the city of Chattanooga here, because in the city of Chattanooga, the city, a delegee of Tennessee, which was the superior sovereign in that case, was permitted to sue Georgia, and there was no immunity in that situation. And that's the same as the immovable property exception that the court discussed in the permanent mission of India. What we have here is the equivalent in the supremacy clause, where the superior sovereign comes from the fact that the United States has to have complete authority with respect to the exercise of eminent domain, and the state is not immune from an action by the United States through its agent for these purposes, with respect to property within the territory of the United States. That's the relevant situation. And Justice Bradley's decision in Stockton is also instructive on this point, which was quoted in the Cherokee Nation case extensively, that Congress can utilize private entities to carry out public functions. It's more efficient. The pipeline here is the entity that is going to construct to profit from it And to require the United States to become involved in a suit like this in aid of something that has already been federally approved would not promote the values of sovereign immunity. Thank you, Counsel. General Feigenbaum? Mr. Chief Justice, and may it please the Court, PennEast cannot hail New Jersey into federal court for two independent reasons. First, the 11th Amendment bars this suit. The United States has a necessary and proper power to file condemnation suits against the state to effectuate all its other enumerated powers. But private companies like PennEast do not, because, as Alden held, private party suits against the states are never proper. State consent to suit by the United States was not consent to suit by those the U.S. might select. And there are important differences between lawsuits by responsible and politically accountable sovereigns and those by private parties. The only way to justify this private suit against the states is to provide evidence of founding-era consent. But condemnation lawsuits against non-consenting states were unheard of at the framing. Second, even where Congress can subject a state to private suit, its choice must be explicit in the statute. Congress would not subject the states to private suit without doing so clearly and this approach advances fundamental protections for fellow sovereigns. That rule also dictates the result here, because the NGA is silent as to the states. That leaves PennEast's complaint about the practical consequences. But those concerns have not been borne out in reality. Other industries expressly lack the power to file condemnation suits against non-consenting states in federal court. Yet oil pipelines and electric transmission, like other infrastructure projects, proceed apace. And New Jersey itself has continued to grant rights-of-way to other natural gas projects even after the decision below. In any event, this is the rare constitutional case in which the parade of horribles can be easily fixed by Congress and it provides no basis for eliminating the state's immunity to private suit. I welcome this court's questions. Counsel, you talked near the end there about the practical problems. Does the state oppose the pipeline? The state has opposed the pipeline in a separate D.C. circuit proceeding, although that's distinct from the challenge we've raised below in this case. Well, that seems to present a significant practical problem. So I don't think it does. I don't think that the sort of landowner veto concern that PennEast raises holds up for two reasons. The first is that other industries expressly lack the power to file these sorts of actions. And as I noted, oil pipelines proceed, electric transmission proceed, and so on. Well, I don't know. Maybe those did or did not cross state property, or maybe the state didn't oppose those, but you oppose this one and it crosses state property. That seems to be a pretty practical problem. So there's no reason to think that other industries have to cross state land any more frequently than the natural gas industry does. And we've included in our briefing examples from other states and in the New Jersey Conservation Foundation briefing indicating that those other industries do cross state land all the time. Well, but your client opposes this pipeline. So if they say no, it doesn't go forward. So to the degree that this court has concerns about that, this is the rare constitutional case in which all of the consequences can be remedied by Congress. And it requires a sort of double speculation on PennEast's part. PennEast is speculating that states will impermissibly try to wield veto powers when there's no evidence from any industry to support that view, and New Jersey itself has granted rights of way to other natural gas pipelines even after the decision below. And then it's again speculating that Congress won't step in, even though Congress has consistently passed new statutes to address problems that industries confront in the condemnation context. I don't think that sort of double speculation is enough to justify eliminating the state's sort of historic immunity to private suit without evidence of founding-era consent. No, no, I'm not suggesting that it's enough to eliminate the immunity. But it does strike me as a concern why supporting Mr. Clement and Mr. Kneedler's argument that you're dealing here with the federal delegee and what the state is doing is, in other words, the federal government in this scenario does become a junior varsity sovereign. The state is blocking the NGA certificate issued by the federal sovereign. Do you have a response to that? Absolutely. I don't think the United States is becoming a junior varsity sovereign. I do think that the United States still has the complete power of eminent domain. I just don't think that resolves this case. The United States has all kinds of complete or superior powers, like the power to recover federal dollars or the power to set patents and punish infringers. But it can't subject the states to private party suit as a means of effectuating that power. And that's, I think, especially true in condemnation. Eminent domain itself is an implied power, meaning it's a necessary and proper way to accomplish other enumerated powers, like the Commerce Clause. But we know that when states are acting under the Commerce Clause, private suits, or when Congress is acting, private suits can't be implied against the states because they aren't necessary and proper. And the way to square that is easy. The United States can condemn sovereign land when it takes responsibility and ownership of the suit, but it can't select a private party to do so over a state's objection, exactly as Justice Scalia put it in Blatchford. Thank you, Counsel. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, what difference would it make if the U.S. sanctioned the proceedings, the condemnation proceedings or efforts that Penney's is now making? I think it would make both dignitary and practical differences for the state. So, obviously, as to the dignitary harms, I don't think we should forget that Penney's is trying to directly subject a state to the jurisdiction of a federal court over its objection, which is a sort of offense to the dignity of co-equal sovereigns. That is exactly what the framers were talking about. But in the end, what does that all mean? So, in practical sense, our concern in this case is that a private plaintiff is the one that gets to decide whether to take state land it might never need, while the pipeline and the route remain subject to so much change, which is something we think a more responsible and politically accountable sovereign would be less likely to do. So, at pages 168, 175, and 235 of the record, there's considerable evidence that Penney's actual route might change. And FERC itself instructed the company to consider a change of the final two miles of the route as part of the future permitting stage and as the process unfolds. But Penney's went and sought eminent domain along the entire original route, which is something that we think the United States would be less likely to do relative to our sovereign land when all of this process is still ongoing. Well, you've said a number of times that it's your sovereign land. How much of this land do you have a possessory interest in? Of the 49 parcels that we're talking about, we have 9 in C, and 40 we have other sorts of property interests to which we hold title. What kind of property interests? It depends. Sometimes agricultural easements, development easements, and the like. So they're not all the same kind across the 40. So let me ask you just an opportunity. I'd like you to respond to the petitioner and, to some extent, the U.S.'s argument that because this is an NREM action, it doesn't implicate sovereign immunity at all. I appreciate the opportunity, Justice Thomas. I think the United States admitted there are a number of cases from this court that suggest just the opposite, that parcels to which the United States or a state have an interest in are lawsuits against the state or the United States itself. And that makes sense. The United States is the one that actually has to litigate this case. The state is the one that has to. The state is the one that's going to lose its parcels, where a private plaintiff is deciding when that happens. And the state is the one that has to participate in an adversarial compensation trial. The immovable property doctrine on which petitioner and the United States are relying was about something else entirely. It wasn't about a general NREM exception or an NREM exception that would extend to New Jersey's land that we own within our borders. It was about property that we own outside of our borders, where we, quote, assume the character of a private landowner and don't function as a sovereign. This court said that in Chattanooga and Schooner Exchange and in the separate opinions in Upper Skagit. And the reason that matters is that the immovable property doctrine would also open us up to private suits, as this court may remember from the Upper Skagit case and the Lundgren's quiet title suit against a tribe. Immovable property isn't just about eminent domain, but it's about property suits generally. And everyone agrees New Jersey's not open to that sort of private property suit for land we own within our borders. Finally, I'd like you to take an opportunity to comment specifically on the delegation, the U.S.'s delegation of its sovereign exemption. So I don't think anything changes because Penn East is relying on delegated or deputized authority. As Alton and Blatchford explain, the United States can always sue the states, and when it does so, it takes political responsibility for the lawsuit itself, controls the decisions in the lawsuit, and doesn't offend our sovereignty. But a private lawsuit is different. What would it take for this to happen, though? Can the U.S. even delegate its exemption? We don't think so, no, because as Justice Scalia put it, consent to suit by the United States is not consent to suit by those who the U.S. might select. So select or delegate or deputize, whatever word we want to use, I don't think this sort of workaround from the usual abrogation rules can really exist in our constitutional scheme. Okay, and on what do you base that? I think we base that on Alton and Blatchford and the lack of any evidence at the founding or in any time since that there's an understanding that simply because the U.S. can bring suit that it can delegate or deputize to someone the ability to bring that same lawsuit. It would really blow a hole in the way this Court has always understood sovereign immunity. Thank you. Justice Breyer? Thank you. Go back for a minute to the late 1940s, early 1950s. Most of the natural gas was in the Permian Basin in Oklahoma and in Texas, and they were on the verge of or had built pipelines to carry that natural gas to California, San Diego, El Paso natural gas, or up to Pennsylvania, over to Illinois, up to Massachusetts. A lot of the states, not a lot, but some were objecting in a whole variety of complex ways, and so Congress passed the Natural Gas Act. Now, they couldn't have built the pipelines unless they had this power, I think. I'm not certain of that, but I don't see how they could have because they need to go look at the map on the map of waterways in which Pennsylvania claims an interest in the Marcellus Shale Coalition. States own waterbeds. They own all kinds of obstacles. But this was passed to build a pipeline. How could they have done it? I don't see it. And having known a little bit about that, since you need the federal power or a government power for a private person to use eminent domain for anything against a private land or by a state, I don't understand how they would have, how any reasonable person would have delegated any eminent domain power to the Natural Gas Act, which was for interstate pipelines, without including the power to proceed against the state. Am I right about that? And if I am right, and therefore it is clearly in this statute, why in heaven's name can't the Federal Power Commission then, or FERC now, have done the same thing? And if they could have done the same thing under law of Congress, why can't they hire somebody? Just as Mississippi hires private prosecutors sometimes in criminal cases, or there are dozens of examples where private persons are delegated under supervision, and here the supervision is close, to go and do something that the public can do by bringing a criminal case, etc., etc. You see the thrust of my arguments. Very historical. But that's been the understanding for the last 80 years. So I think I have three responses to that, Your Honor, if I might. Please. The first is that I think the premise of that question relies on the same misconception that's at the heart of Penny's brief, which is a speculation about the way that states behave. We know from other industries, including the interstate oil pipeline industry. No, I'm sorry. The thrust of my question, why I kept saying historical, is I do know how states behaved in the late 40s and early 50s. And from reading the newspapers, I know that natural gas is a subject of a big argument politically in a lot of states, some thinking it's great for the environment, and others thinking it doesn't go far enough and has risks. Those are the two things I know. Not speculation. So I appreciate that, Your Honor. I think those same things could be said about the oil industry, but we don't see the concerns being raised here, even though they don't have any sort of federal eminent domain authority that anyone would purport allows them to hail non-consenting states into court. And yet they are built anyway. Are they building big oil pipelines, like down from Canada to New Orleans? Sure, but there hasn't been any evidence that a problem in that process has been sovereign immunity, even though everyone agrees that there's no ability to raise federal eminent domain claims against non-consenting states in that context. And I think what that shows is that there's plenty of reasons why pipelines might not get built, having nothing to do with sovereign immunity, but that uncertainty does exist in the industry, which is one of the reasons why we were so nervous about condemnations even before the permitting process had finished. But to take your point on the statutory question for a moment, it's also notable that other Congress has spoken to the issue. It has understood that sometimes it wanted the statutes to include state land, and sometimes it didn't, and sometimes it excluded them, which, if it was true that every industry going through state lands was going to need this power, well, then it would be very strange to see those exclusions. Congress was silent here, and it doesn't give us much to work with. Thank you. Justice Alito? Counsel, sometimes form is dispositive, and you may, in the end, have a winning formal argument, but what I want to look into is whether you have anything more than a purely formal argument. Now, you argue that things might have worked out better for you if FERC, as opposed to Penn East, were conducting the proceeding because the federal government is obligated to negotiate in bad faith, and there's the issue of timing, but I'm thinking your constitutional argument would be, in the end, exactly the same if none of those features appeared in the statute that's involved here. Would it not? So I think formally it would, although I would agree with you that functionally in what's at stake, we'd be talking about something different. So really, it's just about the form. It's the fact that it's Penn East, and it's not FERC. So I don't think that's right. It's not just about the form for New Jersey. And you're hypothetically, of course, took out the substantive concerns that we were afraid of. But in this case, in the case we're actually facing, we do have substantive concerns about this litigation and the calls that Penn East, rather than the United States, are making. I understand that, but if Penn East were required to negotiate in good faith, if all of this was, the timing was they couldn't bring a condemnation action until the root had been finalized so that FERC had approved the very root in question, and knew that it was going over state land, and presumably wanted the land condemned, and all that was left to be done was to file a condemnation action, ascertain the value of the property, you would have exactly the same constitutional objection. As a formal matter, yes, because it's still a lawsuit directly filed against the state by a private party, which we think is exactly what the framers thought would be an offense to the fundamental dignity of sovereigns who can't be held into court without their consent. Is New Jersey's dignity really, in any kind of practical terms, compromised to a greater degree based on the caption of the lawsuit? We think yes, because if it were otherwise, then all manner of this court's cases would have to come out, I think, differently. In Alden, for example, the court was facing a private suit that everyone agreed the United States could have brought instead. But it was the fact that private party was bringing it instead of the United States that created an offense, even if it was sort of just the state as employer, just like New Jersey as landowner. The fact is, the offense to a state's dignity is the private party lawsuit, and that's the through line of all of this court's cases in sovereign immunity. Well, I understand that, but it is a purely formal argument. Okay, thank you. Justice Sotomayor? Counsel, just to be clear, other than your argument that Penn East didn't negotiate in good faith, contrary to the finding of the court below, all of the other arguments you mentioned throughout your presentation to Justice Alito and others are about issues that you litigated in the D.C. courts, didn't you? No, Your Honor. Well, you litigated about whether they should wait, and the government responded, not in the way you liked, but it did. What else did you not have an opportunity to or didn't litigate in that case? So, two things, Your Honor. First, the adversarial compensation trial, to which we're going to be subject if Penn East has a tested compensation trial over the value of sovereign land, where a company can fight tooth and nail to keep away from us the money to which we think we're entitled. So, none of that is ever going to come up. Well, that's true, but that would be true whether it was the government or you. And once the decision is made that land's necessary for a public service, that you're  What was the second thing, Counsel? The second thing was that we did raise issues around the timing, but Firk didn't just say we disagree with you on the timing. We want it to go forward. At page 239 and 240 of the record, Firk said the timing is something to be worked out in the district court with the private party and New Jersey. So, it was sort of washing its hands clean, exactly as we say shouldn't be able to be done by a responsible sovereign. Well, you had the opportunity to litigate that, and you lost, correct? So, we raised it, but they didn't say you have the opportunity and you lose it. They said we'll raise it somewhere else. So, we did. But you could have appealed that. Going to Justice Alito's question about formalistic, it seems to me that history is very important to me. And I think that was the point of Justice Breyer's position, which is that for at least 150 years, states, some states, not all, have been delegating to private parties their power, the power of an eminent domain. And the federal government and other agencies has done it. And no one has raised this argument because, if one accepts Mr. Clement's argument, there was no sense that there was a sovereign immunity to eminent domain, the exercise of eminent domain by the federal government or by a state against its own citizens. And hence, who they delegate that power to, unlike the other cases that we've addressed this issue or this issue has been around that only the state can do. But at least in this narrow field, the in-rem nature of this proceeding has gone differently in history than in the normal cases. How do you respond to that? I don't think that's what the history shows for a couple of reasons. First, the history of the fact that states haven't asserted this argument before, I don't think is all that telling because the National Gas Act is Commerce Clause legislation. And it wasn't crystal clear until 1996 in Seminole Tribe that Congress lacked the authority to subject states to private suit under that power. Since that time, a couple of states have raised this. Texas raised it in 2017. Connecticut raised it in 2003. And we know from 1992 legislative materials that New York did even earlier. But more importantly, I think it makes sense that this comes up infrequently because Penn East is, again, wrong about the way that states behave. Even where states clearly have the authority to withhold consent. We frequently allow for rights-of-way, which is why this hasn't been a problem for other industries and why New Jersey itself granted multiple rights-of-way to pending natural gas pipeline projects even after the decision below. But finally, as FMC put it, modern practice can't overcome the lack of founding-era consent. And so in addition to being not that compelling, I think in the unique context of sovereign immunity itself, the sort of practice to which Penn East and the Solicitor General's office are pointing just isn't that relevant and certainly can't overcome the very clear historical evidence from the founding that no one would have contemplated private condemnation suits against non-consenting states. Thank you, counsel. Justice Kagan? Mr. Feigenbaum, does this suit have to be labeled United States versus New Jersey? And what if there was meaningful supervision by the federal government over Penn East's conduct? Would that be enough? So, Your Honor, this suit does not have to be named as United States versus New Jersey. It is Penn East versus New Jersey, as the court's caption suggests. And there's no naming convention that would have it be the United States in this case. No, no, no. I meant, could the U.S. delegate the power to Penn East, in your view, but keep some sort of supervisory capacity over the suit? Would that satisfy the 11th Amendment? So I think the answer in that case is probably the same one this court gave in Stevens, which is, I doubt it. But what would make that case hard makes this one easy. If the United States actually contained or oversaw and directly supervised the litigation itself in some meaningful way, it would look a lot more like the kind of control that led to the circuit split over key TAMs. And therefore, you could see a different result with the U.S. being the real party in interest. But none of that exists here. You spoke to Justice Alito about the state's dignitary interest and said that this has been a consistent through line in our sovereign immunity cases. Most of those cases in the modern era have had powerful dissents attached to them. And those dissents have basically said, what are you talking about, about this dignitary interest? What dignitary interest does a state have in being, why is it any less or greater if a private party or the United States is involved? So could you explain that to me? What is the supposed dignitary interest? The dignitary interest, which I think comes from the founding era documents, is that it was always understood for any sovereign that you could not be held into court without your consent. That was sort of black letter, pre-founding understanding. And so if it was true that states really did retain the true sovereignty that everyone had promised them when they joined the union, then they would, as a matter of actually being coequal sovereigns treated with that sovereignty, they would have the ability to withhold consent as well. Now, it's not true vis-a-vis other states in the United States because, as we know in international law as well, it's always looked different for sovereign on sovereign sort of litigation, in part because of their responsibility and control, and in part because that's never been understood to offend sovereignty. But if you allow private suits forward against the states when they don't consent to them, it suggests that states really aren't the kind of sovereigns that they were promised and that the founders understood them to be. If you go back to this question of whether there was founding era consent, I think what Penn East would say is that you knew you were consenting to suits against the federal government, and you knew that governments routinely used delegations to effectuate eminent domain suits. So you put those two things together. Why didn't you consent to suits of exactly this kind? So I don't think you can just put those two things together because that syllogism would cause all sorts of problems. Imagine in, say, a normal property context or in the patent context. You know that the United States would be able to have a patent power and file patent lawsuits against infringing states if it saw fit. You know that the United States would be able to empower private patent holders to sue private patent infringers, so why can't private patent holders sue state infringers? Everyone understands that that last step in the syllogism doesn't follow from the others because what we're actually looking for in sovereign immunity cases is state understanding and consent to the idea that they could be held into court, not if a federal power existed, but if a private party could use them against their consent. Thank you, Mr. Feigenbaum. Justice Gorsuch? I'd like to return to the question of whether this is a suit against the state. In some respects, it seems pretty hard to dispute that the state is named as a party, and under Rule 71.1, the complaint had to file suit against both the property and at And, of course, there's going to be compensation due to the state, which would seem to be more in personam than in rem. But there's also a long strand of thinking about condemnation proceedings as in rem, as the notes to the rule make clear. And, of course, we've heard some argument today that that's the better way to conceive of these kinds of suits. Can you speak to that a little further? Absolutely, Your Honor. So I don't think there's any sort of general in rem exception to sovereign immunity. As this court has recognized, a suit directly against a sovereign's property is a lawsuit directly against the state, both formally and functionally, and that's why the Rule 71. What's your common law authority for that? So I think the best authority that we have actually could come from the immovable property doctrine, which existed specifically to draw a contrast to the land that states owned within their borders. So the idea of the immovable property doctrine being cited by both pennies in the United States was that states, when they owned property outside of their borders and got sued… I'm sorry to cut you off there, but I understand that. I remember Upper Skagit. I may be the only person who does, but I do. I haven't gotten settled with that one. It was a delightful assignment. But that has to do with property outside the state. What about inside the state? Well, I think it's cool, and I think it's Minnesota versus the United States explaining that these are suits at law, and that a lawsuit against the United States or a lawsuit against land in which the United States has an interest is a lawsuit against the United States. That's why states can't condemn, for example, tribal land where the United States holds a fee interest. And we can't condemn that land simply by naming the land and choosing not to name the United States, because that is in both form and function a lawsuit against the United It was entirely different in cases like admiralty and bankruptcy, which are the only exceptions where this court has allowed NREM to move forward in that way, based on really unique founding era history that's not present here. In admiralty, it was that admiralty suits were not understood to be law or equity and therefore didn't trigger the application of the 11th Amendment clause, as we know from Justice Story. And then in Hood, it was specifically about the uniqueness of the bankruptcy clause and the fact that jurisdiction is over the debtor's property, not the state's property, and so it isn't formally seeking any affirmative relief from the state. That's Hood at page 450. There's no historical evidence and no example that anyone can point to that would allow for a direct lawsuit against a state's land as somehow distinct from a direct lawsuit against a state. Thank you. Justice Kavanaugh? Thank you, and welcome, General. I just want to ask one question. In your brief, you respond to Penny's arguments about what will happen if you were to prevail in this case, and you respond by saying, well, of course, Congress could take action. And then you say, and this is page 45, but even absent congressional action, Penny's is hardly without options. And then I want to focus on your first one there. First of all, the United States disclaims authority under the NGA to condemn property. The lower courts have had no occasion to consider this question, and this issue deserves greater exploration. So is that a real thing or not, what you're offering there? So below before the Third Circuit, and you can find this, I think, most clearly at pages 20 to 22 of our reply brief, we articulated a theory in which the United States might have an implied power under the structure of the NGA to itself step in, essentially on the theory like the Third Circuit suggested, that it's strange to think of FERC being able to grant private parties the ability to file these suits and not retain that power itself. Since that time, the United States itself has come in at Penny's urging to say we actually don't have that authority. They obviously say it in the gray brief, but they said it in declaratory order as well. So I don't want to pull this court's leg and say they're definitely going to move forward with that. We thought it was a workable theory worthy of exploration, but the U.S. continues to disclaim it. Thank you. Justice Barrett? Is there any space for an inverse condemnation proceeding in this scheme, you know, where the FERC certificate could get issued and Penny could just take over the property and then you could pursue an inverse condemnation proceeding? I don't think so, Your Honor, because as this court held recently in Nick, a taking without compensation violates the self-executing Fifth Amendment at the time of the taking. And so, you know, Penny basically says this lawsuit is to remedy a Fifth Amendment problem, but we think it's a false choice between the Fifth Amendment and the Eleventh Amendment because the U.S. could bring this lawsuit in a way that is absolutely coherent with the Fifth Amendment and with the Eleventh Amendment simultaneously. Let me ask you about the Fifth Amendment and how it might relate to the immovable property doctrine. Do you agree that all of your land or your property is private property for Fifth Amendment purposes, which is what permits you to have a taking claim in the first place? Yes, we agree with the court that state land, sovereign land can be condemned and we have the same rights under the Takings Clause. Okay, so if it's private property for purposes of the Fifth Amendment, why shouldn't we treat it as private property for purposes of state sovereign immunity as well? So I think the court didn't say it was actually private, but just that it was sort of incomprehensible under the Takings Clause that you would be able to have condemnations of sovereign land to which the sovereign was even less entitled to relief than for a private party, and that's how they reasoned it. There's no sort of reasoning here that I think would justify a private lawsuit against a state as somehow necessary and proper from that reading of the Takings Clause. Well, doesn't it bear on the immovable property argument that Penn East is making that, you know, if a state has property, if Georgia has property within the borders of Tennessee, you know, the immovable property of Georgia can be sued because it's treated basically as the equivalent of a private landowner because it's not land within its sovereign territory. But if the Fifth Amendment treats this as private property for those purposes, doesn't that strengthen Penn East's argument about the immovable property doctrine? I don't think so, because the reason that the property was private property outside of our borders was specifically because a state can't be a sovereign in another state's territory. A state can't be sovereign in the United States. We can't be sovereign in Georgia or in Pennsylvania. And the consequence of that, and why I think the theory proves far too much, is that it opens the state up to private property suits like the Lundgren's quiet title suit in Upper Skagit. So suggesting that immovable property doctrine has a role to play here goes well beyond eminent domain because it is not a theory that is actually linked at all to the teachings of the Takings Clause. I want to go back to something you said to Justice Thomas about possessory and the kinds of property interests at stake. You told Justice Thomas that the state had nine possessory property interests. Is that right? That's right. So this action has 42, and then there are seven that are state. So when you combine out of those 49, we get to nine possessory interests. Should we treat that as significant? I mean, deep sea research, we treated that line as mattering. Should we treat that line as mattering here, a distinction between possessory and non-possessory interests for sovereign community purposes? With one important caveat, which is that everyone has always understood for intangible property interests, which is what an easement is. There's no such thing as sort of actual possession in that way, and so the restatements define possession for intangible interests as having title, and we have title to all of the easement interests that we have in this case. So even drawing that line would sweep in all of New Jersey's interests in this particular dispute. Okay, last question. In your view, would there be anything to stop you or any other state from waiting until FERC approves the pipeline's route and then purchasing a property interest and land within the pipeline's path and then asserting state sovereign immunity? Anything to formally stop? No, but there's no evidence any state has ever done that. No, no, no, no. I just asked if there's anything formally to stop. No. Thank you. A minute to wrap up, counsel. Thank you, Mr. Chief Justice. A ruling for Penn East would be unprecedented because it would allow a private party to consent, because it would allow a private company, rather than a responsible and accountable sovereign, to control the litigation, and because it would allow Penn East to decide whether to risk needless condemnations of state land while the pipeline and route remain subject to so much challenge and change, and to decide how much sovereign land is worth in an adversarial compensation trial. But Penn East lacks the evidence to justify that drastic step. When it comes to the Constitution, Penn East provides no founding era evidence that states contemplated private condemnation suits, and when it comes to the NGA, Penn East identifies nothing in the text to show that Congress explicitly endorsed private suits against them. Penn East's condemnation carve-out thus relies on the very evidence this court has rejected so many times before, silence in the Constitution, silence at the founding, and silence in the text of the statute. Thank you. Thank you, counsel. Rebuttal, Mr. Clement? Thank you, Mr. Chief Justice. I may please the court. I'd just like to make three basic points in rebuttal. First, on the delegation or deputization point, I don't think it's right for the state to suggest that this is just like Blatchford or this is just like Stevens. This is a power that's constrained completely by the federal government. Penn East cannot get into court at all unless it is given a certificate for particular properties. FERC continues to have the authority to oversee the actions and could modify the certificate and the authority that FERC asserts for that, and this is directly responsive to Justice Kagan's question, is 15 U.S.C. 717-0. But even beyond that, eminent domain is not like the ability to have a delegated chance to bring a damages action against the state. It's an inherently government function. The state's treasury will be augmented. And for purposes of the action, Penn East is a federal actor for Fifth Amendment purposes, so all we're asking is to extend this parallel logic to the Eleventh Amendment. Second, I want to talk about the in rem and form versus substance. As Justice Alito's colleague showed, the position of New Jersey here is entirely a formal argument, but if we're going to go on form, and I'm going to talk about substance in a minute, but if we're going to go on form, the form of an in rem action is an action against the land. Or if you want a historical framing era source, look at Bushrod Washington's decision in the United States against Bright where he talks about an in rem action being an action against the world. What you're doing is you're settling the rights of the land, and that's why in rem actions are fundamentally different. They are not in personam actions. A foreign owner of land can't block eminent domain or other in rem proceedings just by not showing up because the territorial process of the court doesn't reach them. And importantly, Rule 71.1 does say that the pennies are supposed to name the state as a property owner, but this court in Hood specifically said that provisions of the rules don't change the fundamental form of the action. It was in rem there, it is in rem here, and it is a fortiori because this is an in rem action that can only augment the state treasury. And as to dignity interests, there's not even an allegation of wrongdoing here. So lastly, let me just close by inserting the point that to insert a sovereign immunity defense to the eminent domain authority is to lose the forest for the trees. Sovereign immunity is a stranger in a strange land when it comes to an assertion of eminent domain. And the New Jersey concedes the validity of the federal exercise of eminent domain here. They just want to insist on how it's exercised. And that is not an authority that an inferior sovereign gets under any authority, especially when they're wielding that authority as a property owner to veto a federal infrastructure project. Thank you, Your Honors. Thank you, Counsel. The case is submitted.